## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| JOEY HARPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. |
| | ) | |
| JIMMY HARRIS; MATT | ) | 4:16-cv-01096-VEH |
| MARTIN;  ROBERT | ) | |
| THEAKSTON;  JONATHAN | ) | |
| LANGLEY; JOHN SMITH; | ) | |
| CHRIS BLACK; and DARLENE | ) | |
| HULGAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

In this civil action the Plaintiff, Joey Harper, claims that while he was incarcerated in the Dekalb County Jail (the "Jail") from July 12, 2014, until August 7, 2014, the Defendants violated his rights "as a pretrial detainee under the Fourteenth Amendment in violation of 42 U.S.C. § 1983" when they "were deliberate[ly] indifferent to [his] serious medical needs." (Doc. 1 at 9, ¶¶55, 56) (Count One). The Plaintiff also contends that the Defendants discriminated against him because of a disability in violation of the Americans with Disabilities Act, 42 U.S.C. §§12101-12213 (the "ADA"). (Doc. 1 at 10) (Count Two). The Defendants are: Jimmy Harris,

who was the DeKalb County Sheriff at all relevant times; Lieutenant Matt Martin of the DeKalb County Sheriff's Department (the "Sheriff's Department"), who was the Jail administrator at all relevant times; Dr. Robert Theakston, MD, who worked as the Jail physician at all relevant times and also served as the Jail's medical director[1]; Lieutenant Jonathan Langley, a member of the Sheriff's Department, who worked at the Jail as a registered nurse and the head of the medical department. The Plaintiff also sues John Smith, Chris Black, and Darlene Hulgan, all of whom worked at the Jail in the medical department at all relevant times. All Defendants are sued in their individual capacities only.[2]

The case comes before the Court on the Defendants' Motion for Summary Judgment (the "Motion"). (Doc. 46). For the reasons stated herein the Motion will be **GRANTED in part** and **DENIED in part**.

## II.    STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*,

---

[1] He is also a certified deputy with the Sheriff's office. (Doc. 48-3 at 3(5)).

[2] As to all Defendants except Lt. Langley, the Complaint specifically states that the Defendants are sued in their individual capacities only. As to Lt. Langley, the Complaint does not state, and no argument is made, that he is sued in any capacity other than individually.

477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2)

proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## III.    FACTS[3]

### A.    <u>The Treatment of Benzodiazepine Withdrawal of the Incarcerated</u>

The primary issue in this case is the proper method of treatment of prisoners

---

[3] The facts set out herein are gleaned, in substantial part, from the facts proffered by the parties. To the extent that a party has proffered a fact which is not disputed, it has been included herein <u>exactly</u> as it was proffered, without citation. To the extent that a fact proffered by a party was disputed by another party, the Court first examined the proffered fact to determine whether the evidence cited in support of that fact actually supported the fact <u>as stated</u>. If it did not, the fact was not included. If it did, the Court then looked to whether the evidence cited in support of the dispute actually established a dispute. If it did not, the Court presented the fact as proffered, with citation to the evidence supporting the fact as proffered. If the cited evidence was disputed by contrary evidence, the evidence was viewed, as this Court must, in the light most favorable to the non-movant, with citation to such supporting evidence. If more explanation was needed, the Court included that information in an appropriate footnote. Some facts proffered by the parties, which the Court deemed irrelevant and/or immaterial, may have been omitted. Further, as necessary, the Court may have included additional facts cast in the light most favorable to the non-movant.

undergoing withdrawal symptoms while in custody. In 2014, the National

Commission on Correctional Health Care stated that "[p]rotocols exist for managing

inmates under the influence of alcohol or other drugs and those undergoing

withdrawal from alcohol, sedatives, or opioids." (Doc. 52-5 at 2).

> Detoxification is the process by which an individual is gradually
> withdrawn from a drug by the administration of decreasing doses of the
> drug on which the person is physiologically dependent, of one that is
> cross-tolerant to it, or of one that medical research has demonstrated to
> be effective.

(Doc. 52-5 at 2).

> Inmates experiencing . . . severe alcohol/sedative withdrawal are
> transferred immediately to a licensed acute care facility. . . . Individuals
> showing signs of intoxication or withdrawal are monitored by qualified
> health care professionals using recognized standard assessments at
> appropriate intervals until symptoms have resolved. . . . Detoxification
> is done under physician supervision.

(Doc. 52-5 at 2).

> The treatment for most non-life-threatening withdrawal is amelioration
> of symptoms, which can be managed in the convalescent or outpatient
> setting. . . .
>
> Detoxification and withdrawal are best managed by a physician or other
> medical professional with appropriate training and experience. As a
> precaution, severe withdrawal syndromes must never be managed
> outside of a hospital. Deaths from acute intoxication or severe
> withdrawal have occurred in correctional institutions. In deciding the
> level of symptoms that can be managed safely at the facility, the
> responsible physician must take into account the level of medical
> supervision that is available at all times. Clinical management should

also include the use of validated withdrawal assessment instruments, such as the Clinical Opiate Withdrawal Scale or the Objective Opiate Withdrawal Scale in cases of opiate withdrawal, and the Clinical Institute Withdrawal Assessment of Alcohol Scale Revised in the case of alcohol withdrawal.

(Doc. 52-5 at 3).[4]

The particular drugs the Plaintiff had been prescribed at the time he was incarcerated included Xanax, which is in a class of drugs known as benzodiazepines. In February of 2014, the Federal Bureau of Prisons published a "Clinical Practice Guideline" entitled "Detoxification of Chemically Dependent Inmates" which noted

---

[4] The Plaintiff has also proffered the 2003 standards which provide that "[s]pecific protocols exist for inmates under the influence of alcohol or other drugs or those undergoing withdrawal." (Doc. 52-4 at 2).

> Detoxification refers to the process by which an individual is gradually withdrawn from a drug by the administration of decreasing doses of the drug upon which the person is physiologically dependent, of one that is cross-tolerant to it, or of one that has been demonstrated to be effective on the basis of medical research.

(Doc. 52-4 at 3). "Detoxification is done only under physician supervision in accordance with local, state, and federal laws." (Doc. 52-4 at 2). "Inmates experiencing severe, life-threatening intoxication (overdose) or withdrawal are transferred immediately to a licensed acute care facility." (Doc. 52-4 at 3).

> The treatment for most non-life-threatening withdrawal is amelioration of symptoms, which can be managed in the convalescent or outpatient setting. . . .

> As a precaution, severe withdrawal syndromes must never be managed outside of a hospital. Deaths from acute intoxication or severe withdrawal have occurred in correctional institutions. In deciding the level of symptoms that can be managed safely at the facility, the responsible physician must take into account the level of medical supervision that is available at all times.

(Doc. 52-4 at 4).

that

[b]enzodiazepine withdrawal syndrome can begin within a few hours of last drug use (especially when using short-acting drugs), but may take several weeks to resolve. *Because of the high risk of delirium, seizures, and death, benzodiazepine withdrawal should always be treated.*

(Doc. 52-2 at 14) (emphasis in original). That same report includes the following

table:

Table 3. Symptoms of Benzodiazepine Withdrawal

| Stage | Symptoms |
|---|---|
| Early Withdrawal | Increased pulse and blood pressure, anxiety, panic attacks, restlessness, and gastrointestinal upset. |
| Mid Withdrawal | In addition to the above, may progress to include tremor, fever, diaphoresis, insomnia, anorexia, and diarrhea. |
| Late Withdrawal | If left untreated, a delirium may develop with hallucinations, changes in consciousness, profound agitation, autonomic instability, seizures, and death. **Patients showing signs of late (severe) withdrawal should be hospitalized.** |

(Doc. 52-2 at 15).[5]

## B.   No-narcotic Policy of the Dekalb County Jail

Pursuant to a formal policy (the "Policy") originally proposed by the DeKalb County Commission, and subsequently adopted by Sheriff Harris on June 1, 2011, narcotic medication is not to be "kept, dispensed, or administered in the Dekalb County Jail." (Doc. 48-25 at 2). The policy limits the use of narcotics to "extreme

---

[5] These standards were proffered by the Plaintiff. The Defendants argue, without explanation, that all of the standards set out in subsection A are "non-binding" and "non-exclusive." (Doc. 53 at 8). They cite no alternative standards.

circumstances that are acute and time limited in nature" (doc. 48-25 at 2), and applies to addictive controlled substances, including narcotics and benzodiazepines. Sheriff Harris testified that he believes that maintaining a non-narcotic jail is safer for inmates, staff, and the community. This belief is based not only on his understanding of the past problems in the Jail, but also on his awareness of other problems that are known to arise in detention facilities because of narcotics, *e.g.*, inducing drug-seeking behavior like self-harm and the attempted theft of medical supplies. In his declaration, Sheriff Harris stated that it was his belief that using narcotics at the Jail was not good public policy because it would, "[i]n a sense, feed the inmates' addiction issues." (Doc. 48-26 at 3, ¶3). According to Darlene Hulgan, who worked in the Jail's medical center, the Policy was necessary because the use of narcotics was a "very big problem" in the Jail. (Doc. 48-7 at 8(26)). She stated in her deposition that "[e]verybody wanted them. Everybody sold them. Everybody traded them back there." (Doc. 48-7 at 8(26)).[6]

Sheriff Harris relies on the medical staff to implement the Policy and treat the inmates at the Jail for symptoms of addiction and withdrawal. He agrees that "this

---

[6] In this district is has been noted that "it is axiomatic that jails and prisons have 'a legitimate interest in limiting the use of narcotics by prisoners." *Harden v. S. Health Partners*, No. 5:15-CV-0108-KOB-TMP, 2015 WL 9222662, at *4 (N.D. Ala. Nov. 20, 2015) (Putnam, M.J.), report and recommendation adopted, No. 5:15-CV-0108-KOB-TMP, 2015 WL 9025302 (N.D. Ala. Dec. 16, 2015) (Bowdre, J.) (quoting *Holleman v. Duckworth*, 202 F.3d 273 at *1 (7th Cir.1999) (unpublished opinion)).

policy has been interpreted by the Jail physician medical staff to not permit narcotics and benzodiazepines, like Xanax, to people [who] are prescribed them." (Doc. 48-8 at 9(30)). He does not know whether prisoners are "even allowed to have those medications in a limited form to wean them off of the medications.." (Doc. 48-8 at 9(30)). Instead, when a person is admitted to the Jail and reports having taken a controlled substance, but does not show any signs or symptoms of withdrawal, they will be housed in general population at first. If an inmate starts to have problems or show symptoms consistent with withdrawal, they may be monitored in medical and then housed in a suicide watch cell on medical observation by the Jail staff.

There is not a specific detoxification protocol in place at the Jail. If an inmate is presenting symptoms of withdrawal, Dr. Theakston may prescribe certain medications to them depending on the severity of the withdrawal and the symptoms. However, the policy is that any person who appears to need more or different treatment for withdrawal is to be immediately transported to the hospital for treatment. Medical staff is charged with the implementation of this policy and more generally with healthcare in the Jail. Neither Sheriff Harris nor Lt. Martin are medical professionals, and they do not interfere with or second-guess the judgment of the medical professionals employed at the Jail.

### C.     The Plaintiff's Incarceration in the Dekalb County Jail

#### 1.    *Booking*

Harris was arrested on July 11, 2014, by the Boaz Police Department for non-payment of child support, and was booked into the Dekalb County Jail on July 12, 2014. During booking, the Plaintiff reported that he took Nitroglycerine, Methadone, Xanax, and Soma[7], and that he had previously suffered a broken back and dislocated pelvis from an automobile accident.[8] Harper had his bottles of medication with him during booking. Harper also informed the Jail's medical personnel that he had a history of seizures, with the most recent seizure two months prior. The booking paperwork notes that the Plaintiff had suffered a seizure about two months prior to his incarceration. No signs or symptoms of withdrawal were noted at the time.

At the time of the events of this case, the Plaintiff was married to Beth Harper,

---

[7] While it is undisputed that "[w]hen he was arrested he had medicine in his pocket" (doc. 47 at 8, ¶10; no dispute by Plaintiff), it is unclear what medicine he had. It is also undisputed that the Jail property intake form does not reflect that he had any medication.

[8] The Defendants state that he "arrived at the [Jail] . . . addicted to benzodiazepines (Xanax) and methadone." (Doc. 47 at 3). Later in their initial brief they describe him as "an addict." (Doc. 47 at 4). As noted, the Plaintiff had been underlined_prescribed these medications. The Federal Bureau of Prisons 2014 Clinical Practice Guidelines provide:

> Although recreational use and abuse of benzodiazepines does occur, most inmates who present with benzodiazepine dependence had been prescribed these medications previously to treat a psychiatric disorder.

(Doc. 52-2 at 14).

who is now known as Beth Harper Stewart. According to Stewart, at the time the Plaintiff was arrested he was living off of protein shakes and milkshakes and experiencing other issues related to "achalasia restricture," an esophageal condition that limited Harper's ability to take in calories and ultimately required surgery. (Doc. 48-13 at 5(14-15); at 11(39); at 22(82-83)); *see also* doc. 48-14 at 13-14, 16-17).[9] Stewart called the Jail, informed the personnel there of this condition, and requested that Harper receive protein shakes, sometimes referred to by the parties herein by the brand name "Ensure." Harper also disclosed this condition when he was booked into the Jail and requested a special diet, in particular Ensure shakes.[10]    All inmates go through a medical screening when booked into the Jail. In this case, the Plaintiff's medical screening was conducted by Chris Black, who was a paramedic working in the Jail at the time. No significant medical problems needing immediate attention were noted, although Harper was given a bottom bunk. Black testified that when an inmate with a seizure history comes in, "I put him on a low bunk profile." (Doc. 48-5 at 7(22-23)). The Plaintiff's weight was listed as 215 pounds, but the Plaintiff states

_____

[9] The Defendants correctly note that the Plaintiff's medical records show that a dysphagia swallow test conducted on the Plaintiff on August 9, 2014, revealed that the Plaintiff had "[n]o difficulty swallowing."  (Doc. 53 at 4, ¶100) (citing doc. 48-24 at 323).

[10] Suicide watch logs completed regarding the Plaintiff indicate that Plaintiff was given broth and Ensure on July 22, 2014, at 3:45 p.m. and 4:45 p.m. (Doc. 48-18 at 17). He was given Ensure on July 24, 2014 at 11:15 a.m. (doc. 48-18 at 25), and broth on July 24, 2014 at 4:00 p.m. (doc. 48-18 at 26).

that he actually weighed 246 pounds.[11]

On July 14, 2014, Hulgan faxed a request for records to the Plaintiff's physician, Dr. Nicholas C. Pantaleone, asking that Harper's records be provided "ASAP." The Jail summary reflects that a second request had to be sent on August 7, 2014, and that the records were not actually received until August 8, 2014. Dr. Pantaleone had prescribed the Plaintiff 10 mg Methadone, 350 mg Soma, and 2 mg Xanax to be taken three times daily.[12] Harper had been taking Xanax since he was prescribed it in 2000.

### 2.    *Harper's First Visit to the Hospital*

On July 15, 2014, at 12:11 p.m., the Plaintiff was seen by Black in medical.

---

[11] In his deposition, Harper was asked his weight on the date of his arrest and the following exchange took place:

> A.    246, I believe is the exact weight whenever I went there. That's what they weighed me at, 246.
>
> Q.    Are you sure it was 246 and not some lesser amount? Because I have you at 215.
>
> A.    215, I know where it came from, but I know I wasn't no 215 pounds. That's light. I never stayed at that. I mean, I was always a lot bigger than that. I've always been a lot bigger than that.

(Doc. 48-14 at 13).

[12] The Defendants proffer that "Dr. Pantaleone eventually lost his medical license for over prescribing narcotics." (Doc. 47 at 9, ¶15; *see also* doc. 47 at 3). They refer to his clinic as a "pill mill." (Doc. 47 at 3). These allegations are not material to whether the Defendants were deliberately indifferent to the Plaintiff's severe withdrawal symptoms, and they will not be included as "facts" or considered by the Court.

Black noted that Harper had complained of being weak and stated "that there are cameras looking into his eyes and reflecting beams back into a helmet." (Doc. 48-17 at 9). Medical notes reflect that Harper's vitals were taken ("blood pressure 125/80, HR 86, Resp. 16, Temp. 97.8 Wt. 210"), and it was noted that he appeared to be "[w]ell nourished and well developed." (Doc. 48-17 at 9). It was noted that the Plaintiff had delusions but no suicidal ideations. Under the Assessment section, was written: "AMS [Altered Mental Status] ? Medication Withdrawal." (Doc. 48-17 at 10). Jail records note that one of the Plaintiff's inactive medications was listed to be Xanax. The plan was to take him to DeKalb Regional Medical Center ("DMRC") for further evaluation. It is undisputed that these notes were reviewed by Dr. Theakston.

Thereafter, Black transported the Plaintiff to the hospital. Black could not remember exactly when he notified Dr. Theakston that he had done so, but Black states that he probably would have contacted him afterwards. Black also testified that he would have provided the hospital with the records that he had available.

The nurse's note in the DeKalb Regional Medical Center's records for July 15, 2014, at 12:43 p.m. regarding the Plaintiff states: "Presenting complaint: Patient states: has been off methadone and [X]anax for past 4 days and now having [] altered mental status and seeing things." (Doc. 48-21 at 8). Harper was noted to be well nourished, awake, in no acute distress, and without thoughts of

hopelessness/helplessness or suicidal ideation. Harper's weight was listed at 210 pounds. The attending physician, Dr. Shannon Morgan, noted that the Plaintiff refused to answer her questions (although he had answered the triage nurse's questions) but followed direction without difficulty. She noted that he had a history of chronic drug use. Blood tests, an EKG, and a CT scan were all performed. All were normal, except that benzodiazepines and methadone were found in the Plaintiff's system. He was given fluids and Zofran.

At 3:42 p.m. the Plaintiff was discharged and it was noted, "Patient awake, alert and oriented x 3. No cognitive and/or functional deficits noted." (Doc. 48-21 at 9). The Discharge Instructions state, "Narcotic withdrawal – brief." (Doc. 48-21 at 5). Follow-up was recommended in 2-3 days with Dr. Theakston to recheck. The ER records show that Dr. Theakston was contacted and that Dr. Theakston was responsible for continuity of care following discharge.

At 5:36 pm, Lt. Langley completed a note in the Plaintiff's jail records which stated, "Inmate returned from DRMC with diagnosis of opiate withdrawal. He was [discharged] without prescription meds. [H]e was placed in observation in holding area of the jail." (Doc. 48-17 at 11). The plan was to "[m]onitor in holding until

further notice." (Doc. 48-17 at 11).[13] This note too was subsequently reviewed by Dr. Theakston.

Regarding why the Plaintiff was not admitted to the hospital, the following exchange took place in Dr. Theakston's deposition:

> Q.      The reason Mr. Harper wasn't admitted into the hospital was because you chose not to have him admitted?
>
> A.      That might be correct. While I admit my private patients to the hospital and I have admitting privilege for them, the patients in the jail, I'm contracted to be the doctor to provide medical here at the jail. I am not their personal physician. When they go to the emergency department, they are considered unattached patients, and the hospital or the emergency department staff would contact the on-call physician regarding admitting those patients. It's not a failure on my part to admit them, because those are not my private patients.

(Doc. 48-3 at 17(62)).[14] Dr. Theakston, who also works as a physician at the emergency room where Harper was treated, concedes that he has admitted patients who were "not even in as bad a condition as Mr. Harper." (Doc. 48-3 at 17(62)).

---

[13] Because an inmate cannot be housed full time in the medical ward, which is not staffed 24 hours a day, the Plaintiff was placed in the holding cell area which is generally staffed and monitored and close to the medical area.

[14] It is unclear from this excerpt how it "might be correct" that Harper "wasn't admitted into the hospital was because [Dr. Theakston] chose not to have him admitted," when Dr. Theakston also testified that "[i]t's not a failure on [his] part to admit [prisoners taken to the ER], because those are not [his] private patients."

### 3.    *Harper's Possible Seizure*

On July 16, 2014, at 11:32 a.m., Lt. Langley made the following note: "Inmate observed in cell sitting on floor looking around. [Five] minutes later inmate slid down the wall to a laying [sic] position on his back. [N]ot responsive to verbal stimuli. [I]nmate was transferred and released from DRMC last date for AMS. His dx [diagnosis] was drug withdrawal." (Doc. 48-17 at 18).

Harper's vitals were taken. Lt. Langley assessed that the Plaintiff possibly had a seizure due to drug withdrawal, but the Plaintiff was not sent to the hospital.[15] Instead, Lt. Langley received a verbal order from Dr. Theakston to begin the Plaintiff on 500 mg Keppra, an anti-seizure medicine, at night for ten days. The mental health department was contacted to evaluate him.

### 4.    *Harper Is Placed on Suicide Watch*

On July 16, 2018, hours after Harper's seizure, Harper made suicide threats and was placed by Smith on a suicide protocol. Harper was placed in an observation cell under 24/7 lighting with a concrete slab for a bunk and without a blanket, mattress, or clothes. At 10:44 p.m., Smith sent an email to Lt. Langley, with a copy to Theakston, reporting that the Plaintiff refused to take the Keppra prescribed to him,

---

[15] Smith testified in his deposition that inmates are not always taken to the hospital after they have a seizure. (Doc. 48-6 at 9(32)).

that the Plaintiff was "awake and ambulatory" all night but most of his responses were "inappropriate," and that he had been put on suicide protocol. (Doc. 48-17 at 20).

Suicide watch logs appear in the record. These logs began on July 16, 2014, and continued through July 30, 2014, when the Plaintiff was removed from suicide watch. The logs show that Harper was agitated, spent substantial time just screaming (45 entries), did not sleep, only ate limited amounts, and spent hours just lying on his bunk and shaking (61 entries).[16] The logs also show that jailers were required to clean his cell on multiple occasions.

### 5. *Harper's Second Visit to the Hospital*

At approximately midnight on July 17, 2014, the Plaintiff fell and bumped his head, causing a one-inch laceration. It is unclear from the record whether the Plaintiff had a seizure, but Black agreed in his deposition that "one reason that somebody would fall and bump their head is because they have a seizure." (Doc. 48-5 at 17(62)).

Harper was transported to DeKalb Regional Medical Center by Officer Seth Cagle where he was treated and released. No medications were sent back with the

---

[16] As noted, on multiple occasions the logs note that the Plaintiff was on the bunk "shaking." Although the Plaintiff testified in his deposition that he was cold (doc. 48-14 at 81), he did not state that that was the reason that he was shaking. Correctional Officer Taylor Johnson Sparks testified that the Plaintiff was shaking because he was in a thin suicide gown and was cold. (Doc. 48-11 at 4(12)). Later in his deposition, however, Sparks acknowledged that he was only "assuming" that Harper was shaking because he was cold.

Plaintiff. The physician's note said

> Patient fell from a height of 2 – 3 feet from a bunk bed… The patient sustained an injury to the head, laceration… The patient has been recently seen in this Emergency Department. He was seen here on 7/15/14 about 12 noon for AMS and discharged back to jail. Labs done then was (sic) unremarkable except for UDS showing positive for Methadone and benzos.

(Doc. 48-22 at 4). Except for pain caused by the laceration, the notes indicated that the Plaintiff was ambulatory; in no apparent distress; cooperating; awake, alert, and oriented; and that there were no signs or indications of neglect, such as malnutrition. The Plaintiff also denied suicidal ideation. The laceration was cleaned and stapled, and the Plaintiff was given Zofran again because he complained of nausea. When discharged at 2:20 a.m., the Plaintiff was "awake, alert and oriented x 3. No cognitive and/or functional deficits were noted." (Doc. 48-22 at 7). The Plaintiff's weight was listed as 200 pounds.

In his deposition, Black agreed that there is no evidence that anyone from the Jail had communicated to the hospital during this visit that a previous seizure may have happened. (Doc. 48-5 at 29(112)). Lt. Langley agreed that the hospital should have been given this information. (Doc. 48-2 at 12(44)).

The discharge instructions state that the Plaintiff was to get his staples removed in 9-10 days, which would be around July 27. The Jail medical record does not show

that the Plaintiff was taken back to the hospital for staple removal or that they were removed by Jail personnel.

### 6.     *Harper's First Court Appearance*

On July 18, 2014, the Plaintiff had his first court appearance. The proceeding was conducted by video. According to the order issued as a result of that hearing, Harper informed the court that he thought that "his family made a child support payment for him about the time of his incarceration." (Doc. 48-16 at 15). The court found no payment.

### 7.     *Harper Is Interviewed by a Mental Health Professional*

On July 23, 2014, the Plaintiff was seen by Debby Carter of CED Mental Health (the DeKalb County Mental Health Department) from 8:08 AM to 9:12 AM. Ms. Carter is a licensed professional counselor, and, as part of her position in 2014, she saw inmates at the Jail. She visited the Jail and provided assessments and counseling and could refer inmates to in-patient treatment. She vaguely remembered the Plaintiff.

Carter's notes reflect difficulty in obtaining background information from Harper. However, the Plaintiff was able to provide some correct background information, such as that he had previously worked for a security company, the number of his children, and his education level. Some information that he gave was

incorrect, such as the number of his marriages. Carter's notes state that Harper was not sleeping well and was experiencing auditory hallucinations and paranoia because he believed that someone put pencil shavings in his cell and was watching him. Ms. Carter concluded that the Plaintiff was suffering from a psychosis, not otherwise specified, and planned to pursue in-patient hospital care for him.

On August 7, 2014, Ms. Carter spoke with Shane Healey at Gadsden Regional Medical Center who told her that "it sounded like" the Plaintiff "was in acute benzo withdrawal." (Doc. 48-23 at 2). Ms. Carter did not believe that the psychosis was caused by drug withdrawal at that point. She did not rule out a medical cause to the Plaintiff's psychosis, which is why she sought in-patient hospitalization at Gadsden Regional Medical Center. She conferred with Lt. Langley regarding the Plaintiff's history, care, and treatment.

### 8. *July 23, 2014*

Later in the day on July 23, 2014, the Plaintiff had another episode of non-responsiveness that Lt. Langley assessed in a note as a "recurrent episode of AMS." Harper had been alert an hour before this note. The Plaintiff's vitals were taken. The plan was to keep the Plaintiff in booking and to monitor him. This note was reviewed by Dr. Theakston.

At 10:36 p.m. a note is made by John Smith regarding an evaluation and

well-being check made on the Plaintiff by Dr. Theakston. Smith believed that the Plaintiff was lucid and kempt during the well-being check and that his answers and statements were appropriate. Dr. Theakston testified that the Plaintiff "seemed very slow to respond to questioning. At times, some of his answers were nonsensical. At times, he would not answer at all." (Doc. 48-3 at 5(14)). It is undisputed that on that date Dr. Theakston noted that the Plaintiff had begun experiencing altered mental status a few days after being removed from Xanax and Methodone. (Doc. 47 at 17, ¶46; Plaintiff does not dispute). Dr. Theakston ordered that the Plaintiff be placed on .5 mg of Risperidone, which is a mild anti-psychotic which would help the Plaintiff sleep. He also ordered that the Plaintiff be allowed one hour outside each day and that he be allowed to shower daily. (Doc. 48-17 at 27). Dr. Theakston ordered the treatment because he believed that the Plaintiff's circadian clock needed to be regulated. Regarding his impressions at this time, Dr. Theakston testified:

> Now, multiple days later, he continues to have altered mental status. I think at that point you have to say maybe this isn't completely drug withdrawal. This seems to be going on for a longer period of time. We now have to entertain that this altered mental status is more mental psychosis.

(Doc. 48-3 at 11(37)). However, he admitted that ruling out the medical causes for his psychosis and related symptoms on July 23rd would perhaps have been better accomplished in a hospital setting. (Doc. 48-3 at 14(52)).

### 9.    *July 28, 2014*

On July 28, 2014, the Plaintiff was seen and treated for foot pain/infection. He was prescribed antibiotics. The note reflects that the Plaintiff's vitals were taken and that he was still on the Risperidone, but that its dosage could be increased to 1 mg. The Plaintiff was able to describe his complaint. Lt. Langley discussed with the Plaintiff the importance in complying with the treatment regimen, since Harper would occasionally refuse to take his medication.[17] Harper's weight was noted to be 196 pounds.

### 10.    *July 30, 2014*

On July 30, 2014, Harper was seen by Carter and taken off of suicide watch. That same day, the Plaintiff was taken to DeKalb County Mental Health and was evaluated by its medical director, Dr. Richard Grant, who is a psychiatrist. Dr. Grant diagnosed the Plaintiff as having a psychosis, not otherwise specified, and prescribed 20 mg Zyprexa, which is an antipsychotic/mood stabilizer medication.

Lt. Langley observed that the Plaintiff's altered mental status would come and go. Lt. Langley's opinion at the time, and still today, is that the Plaintiff's issues were mental health related and not from drug withdrawal. (Doc. 48-1 at 35(136)).

---

[17] It is undisputed that from July 16, until his release, Harper refused his medication at least 6 times.

### 11.   *August 2014 and Release from the Jail*

On August 2, 2014, Harper got into an altercation with officers after he would not stop hitting a door and yelling profanity. Lt. Martin signed off on the report of this incident. On August 4, 2014, Harper got into an altercation with officers after he would not stop beating his head against a wall. He was treated by Lt. Langley. After showering and being placed back in the cell, Harper continued beating his head against the wall. Lt. Martin was informed and signed off on the report of this incident.

On August 5, 2014, the Plaintiff was seen again by Carter. The Plaintiff stated that he was hearing voices but did not know what they were saying. He was picking at things on his clothing. The Jail staff told Carter that the Plaintiff had been acting like "a log truck." She was also informed that when he is out of the cell and outside he acts "OK." At the interview the Plaintiff was oriented to time, place, and person and had normal appearance and affect.

On August 7, 2014, the Plaintiff was evaluated again by Lt. Langley. The Plaintiff became lightheaded when he was taken outside. Lt. Langley noted that the Plaintiff was unsteady and making motions like he was eating something. His vitals were taken, which showed that the Plaintiff weighed 191 pounds. The Plaintiff was given water and an Ensure. He quickly consumed them, requested more, and was given more and lunch. Lt. Langley requested another mental health evaluation on the

Plaintiff.

On August 7, 2014, Carter spoke with Lt. Langley who expressed to Carter his concern that the Plaintiff was getting worse as he was experiencing weight loss and dehydration. Lt. Langley wanted to pursue inpatient treatment. Carter testified that, on that same day, Lt. Langley also expressed to her his concerns about Harper and said, "If we don't get him out of here, he is going to die." (Doc. 48-13 at 15(53)).

On August 7, 2014, after his bond was lowered and paid, the Plaintiff was released from the Jail to his wife, mother, and stepfather. Upon his release, the Plaintiff immediately resumed taking Xanax and Methadone.

### D.    Dr. Theakston

Dr. Theakston admits that the reason that patients are weaned off of benzodiazepines and opiates is to minimize potential complications which can be connected with withdrawal. (Doc. 48-4 at 4(12)-5(13)). He concedes that severe drug withdrawal generally needs to be treated in a hospital. He agrees that when Harper was in the Jail he was at risk for severe withdrawal because he was withdrawing from three drugs and not just one, because of his history of seizures, because of the length of time he had been taking Xanax, and because he was taking a higher dose of Xanax. Dr. Theakston further concedes that "[a]ll patients with an altered mental status should be admitted into the hospital." (Doc. 48-3 at 10(36)).

Dr. Theakston concedes that in his work as an ER doctor he would hospitalize a person like Harper:

> Q.     If a patient comes in with a history of cold turkey benzodiazepines use withdrawal over multiple days with altered mental status and a fall that lead to a head injury and an observed possible seizure, at least one, are you going to -- aren't you going to admit that person?
>
> A.     I would probably admit that patient.

(Doc. 48-3 at 21(79)).[18] He continued:

> Q.     . . . Do you have any opinion about whether Mr. Harper's withdrawal symptoms should be considered severe or not given when he started having seizures?
>
> A.     Yes. I would say seizures indicate at least a moderate level of withdrawal.
>
> Q.     Isn't it generally accepted that if somebody is experiencing seizures that are likely connected to benzodiazepine withdrawal, that they need to be monitored and evaluated in a hospital?
>
> A.     Typically.
>
> Q.     Was the hospital ever informed that Mr. Harper was experiencing seizures?

--------

[18] In his deposition, Black agreed that detention officers are not "equipped to be able to monitor somebody going through Xanax withdrawal seizures," and that the only way to . . . safely take care of [such a person] is by sending him to the hospital." (Doc. 48-5 at 22(81). Hulgan too agreed that if someone is going through withdrawal and they start having seizures, that they should go to the hospital. (Doc. 48-7 at 9(30)). Smith agreed that a patient who is "probably withdrawing from Xanax who has seizures" should go to the hospital "if they're unstable." (Doc. 48-6 at 12(48)).

A. I don't know the answer to that.

Q. Mr. Harper was not sent to the hospital once he started apparently experiencing seizures, right?

A. Correct.

(Doc. 48-3 at 20(75-76)). However, Dr. Theakston says his treatment of Harper was limited by Sheriff Harris's no-narcotic policy:

Q. [W]hat would you prescribe to treat benzodiazepine withdrawal?

A. Well, this is a no-narcotic facility, so benzodiazepine withdrawal in the facility here can be a problem. Typically, that's manifested by seizures, and, typically, we treat those with antiseizure medication."

(Doc. 48-3 at 19(70-71)). He interpreted the Jail's policy to not allow for weaning someone off narcotic medications and benzodiazepines (doc. 48-4 at 6(17)), and he knew that there are consequences to that interpretation (doc. 48-4 at 6(17), explaining:

I understood as a result of a policy, since we wouldn't be prescribing those particular medications, that we had to be aware of the potential complications as a result of that and take the appropriate measures.

(Doc. 48-4 at 5(15)). Dr. Theakston did not implement any protocols.

There is no evidence that Dr. Theakston ever performed a physical exam on the Plaintiff, and Dr. Theakston could not recall if he did one. (Doc. 48-4 at 25(94-95)). Dr. Theakston only saw the Plaintiff face to face once. (Doc. 48-4 at 25(95-96)). Dr. Theakston agreed that if Harper had benzodiazepine psychosis sound or light could

exacerbate it. (Doc. 48-4 at 28(107)).

While Dr. Theakston claims he believed Harper might be having a mental issue, he concedes that a medical cause (i.e., benzodiazepine withdrawal psychosis) was clearly part of the picture and needed to be ruled out first, which, because Harper was not sent to the hospital for this purpose, was never done.[19]

### E.    After Incarceration in the Jail

Harper's wife states that after Harper left the Jail he was not only in a psychosis, he was also emaciated, pale, sickly, covered in bruises and sores, and so weak and sick he could not walk on his own. Harper had lost at least 24 pounds, over 10 percent of body weight, during his incarceration.[20] It is also undisputed that Harper's personality changed as a result of what happened to him in the Jail, causing his divorce.

On August 9, 2014, the Plaintiff was admitted to Gadsden Regional Medical Center. Upon admittance, the Plaintiff tested positive for Xanax and Methadone. The Plaintiff was tested for dysphagia. The test noted no difficulty in swallowing and

---

[19] In his deposition, Dr. Theakston stated that medical "typically" has to be ruled out before a patient's issue is treated as psychological. (Doc. 48-4 at 26(98)). However, he also testified that the cause of the Plaintiff's psychosis "may even be multifactoral." (Doc. 48-4 at 30(115)).

[20] According to Jail records, Harper went from 215 to 191 lbs. during his incarceration. As noted previously, Harper believes he actually weighed more than 215 pounds, when he was arrested.

noted that no intervention was required.

On August 11, 2014, while in the hospital, the Plaintiff was seen by Dr. Adam Pruett, a psychiatrist. The note reflects that when Dr. Pruett told the Plaintiff that he did not want to continue giving him Xanax because of the other medications that he was on, the Plaintiff stated that he wanted to go home and that he did not want to engage in care with him. The Plaintiff has not sought psychiatric treatment following his release from the Jail.

### F. **Dr. Homer Venters**

The Plaintiff's expert, Dr. Homer Venters, opined as follows:

> The accepted standard of care in correctional medicine is to provide a gradual taper off of benzodiazepines, which can be effectively achieved over a matter of weeks. This standard of care also involves switching patients from quick acting agents like Xanax (alprazolam) to longer acting ones such as diazepam or clonazepam. Here again, the community standard of care has been fully integrated to correctional health settings because of the considerable risk of death when this approach is not taken.

(Doc. 48-30 at 7).

> Although benzodiazepine withdrawal is a common concern for correctional health physicians, any primary care or emergency room physicians would encounter this concern relatively commonly and the identification of benzodiazepine withdrawal is not a complicated clinical process. Because benzodiazepine withdrawal can prove fatal, clinicians who cannot effectively monitor and treat these patients must ensure that they are transferred to a higher level of care. In a jail setting, if long acting benzodiazepines were not available to effectively taper Mr. Harper off his Xanax, jail health staff had two options. First, they could

have transferred him for treatment of benzodiazepine withdrawal at a hospital or other setting or second, they could attempt treatment with alternative medications including Visteril, Propanolol or Buspirone. These medications do not represent a community-standard of care for treatment of benzodiazepine withdrawal but they can be used to reduce symptoms, in conjunctions with close medical monitoring.

(Doc. 48-30 at 8).

[H]ealth staff continued to ignore the most likely (and well documented) cause of Mr. Harper's seizures and other complications of benzodiazepine withdrawal and made efforts to prescribe and administer an antipsychotic as well as antiseizure medication. Neither of these medications was appropriate given the knowledge of serious benzodiazepine use and timing of neurological symptoms of seizure, agitation and volatility that appeared in weeks 2 and 3 of detention. The dosage of Risperidone prescribed to Mr. Harper was not one used to treat serious psychiatric symptoms such as psychosis. The initial dosage for use of Risperidone is generally 2-3 mg per day with titration up over time to address unresolved symptoms. Risperidone is used in smaller dosages, such as the one prescribed to Mr. Harper, for sleep or to address anxiety.

(Doc. 48-30 at 9).

By ignoring Mr. Harper's existing medical records, jail health staff created the opportunity for him to cycle between the Emergency Department and jail, with a worsening clinical status that escaped hospital staff due to lack of information and jail health staff due to an apparent willful ignorance of the obvious conclusion from their records–that Harper was in late benzodiazepine withdrawal and obviously required a higher level of care than the jail could provide.

(Doc. 48-30 at 9). Dr. Venters explained that Harper's non-responsiveness on July 23

"provided dramatic evidence that he required a higher level of care."(Doc. 48-30 at

11). According to Dr. Venters, the Defendants' actions constitute a "gross variation

from the most basic elements of correctional health." He states:

> Had basic standards of correctional health been followed, Mr. Harper would have likely never experienced his seizures and altered mental status, and had the jail health staff exercised even basic clinical judgement [sic] and reviewed their own records, they would have recognized the symptoms as being benzodiazepine related and initiated treatment.

(Doc. 48-30 at 11). He states that

> [j]ail health staff not only ignored the most obvious cause for Mr. Harper's deterioration, they failed to take any meaningful action to assess him for other potentially life threatening medical problems as alternate causes. The failures in Mr. Harper's clinical care were potentially fatal and without major changes in the policies and practices of the jail health service, I believe they could recur with fatal consequences at any time.

(Doc. 48-30 at 11).

### G. Lieutenant Langley

Harper's wife called the Jail multiple times a day regarding her husband. She primarily spoke to Lt. Langley.[21] The Jail routinely has inmates withdraw from benzodiazepines "cold turkey," but Lt. Langley does not recall anyone having the symptoms that the Plaintiff displayed. Lt. Langley stated to Harper's wife that Harper was in "bad shape," "not eating," that if Harper did not get out of the Jail he would die, that he had been watching Harper go downhill, and that Harper was slowly dying.

---

[21] Stewart testified that she believed that Lt. Langley was truthful with her. Stewart described Lt. Langley as "an amazing man" and that, if not for him, the Plaintiff probably would have died. (Doc. 48-13 at 15(55)).

According to Stewart, when Lt. Langley first told her Harper was not in good shape it was roughly one-and-a-half weeks into his incarceration, which would be around July 23, the date Harper was non-responsive for an hour. They specifically discussed that Harper was not eating well. The following exchange took place during Stewart's deposition:

> Q.  . . . Lieutenant Langley led you to believe he was powerless to help Joey --
>
> A.  Yes.
>
> Q.  -- who did he indicate controlled whether Joey could get out and go to the hospital or whatever?
>
> A.  I don't remember the --
>
> Q.  Did he say it was the courts? The sheriff? [] Martin?
>
> A.  It was up to the jail administration, whomever that may be, whoever is involved in that.

(Doc. 48-13 at 30(116)-31(117)). The deposition continues:

> Q.  Did he tell you that he, in fact, had the power to send Mr. -- Joey to the hospital?
>
> A.  I don't recall.
>
> Q.  What did he say that gave you the impression that it was up to jail administration?
>
> A.  I want to say that's what Mr. Langley told me.
>
> Q.  Okay. Your recollection today is that he told you that it -- that,

you know, the obstacle of getting Joey out to get the medical treatment he needed was jail administration?

A.     Yes.

Q.     Now, did he indicate to you whether that was the sheriff in particular or the jail administrator in particular, or was it just collectively jail administration?

A.     My understanding, it was -- it was all, the sheriff, the jail administration, or the head -- what you -- Mr. Martin and all that, yes. I believe it was.

(Doc. 48-13 at 32(123)). They specifically discussed drug withdrawal and Harper's need for medical treatment outside the Jail but never discussed getting him admitted for psychiatric treatment. The day before Harper was released, Lt. Langley told her, "If we don't get Joey out of here, he's going to die." (Doc. 48-13 at 32(122)).

Except for the suicide logs, there is no documentation of any regular monitoring of Harper by Lt. Langley or other medical staff. However, Lt. Langley says he checked on Harper every day. Lt. Langley says he was aware that from July 15 until August 7, Harper was experiencing hallucinations and was agitated, not eating much, and not drinking much. Lt. Langley admits that he was the primary person overseeing Harper's care, and that he was aware that seizures are associated with benzodiazepine withdrawal. Still, Lt. Langley chose not to send Harper to the hospital after his possible seizure on July 16. According to Lt. Langley, in addition to the documented seizure on July 16, the probable seizure that caused the fall and

head injury at midnight that same night, and the documented non-responsiveness on July 23, Harper experienced other periods of nonresponsiveness that were not documented. It is undisputed that Harper's repeated instances of non-responsiveness are classic postictal behavior that shows Harper continued to have withdrawal seizures. (Doc. 51 at 23, ¶74; doc. 53 (no dispute)).[22] Lt. Langley says he did not know the cause of Harper's condition, but recognized that Harper continued to deteriorate.

By July 28, Harper had a foot infection. By August 2, Harper had even become combative. Lt. Langley recognized that Harper was being subjected to 24/7 lighting, which may have been an aggravating factor regarding Harper's condition. Even though Harper got worse and continued to experience seizures and was otherwise deteriorating, Lt. Langley did not send Harper to the hospital for evaluation.

Dr. Theakston never told Lt. Langley that he believed Harper's condition was not medical.

Lt. Langley started pushing to have Harper's condition treated as having a mental problem. He contacted Carter, who testified that Gadsden Regional Hospital felt that the Plaintiff's psychosis developed as a result of benzodiazepine withdrawal.

---

[22] Merriam-Webster defines "postictal" as "occurring after a sudden attack (as of epilepsy)// postictal drowsiness." https://www.merriam-webster.com/medical/postictal.

(Doc. 48-10 at 6(17)). The following exchange took place in Carter's deposition:

> Q.      . . .Did the possibility of there being a drug withdrawal psychosis come up in your analysis or any conversation with anybody else before that's what Gadsden Regional said to you?
>
> A.      I believe that Jonathan Langley and I probably talked about that. I just – from what I remember, that was just not what my gut feeling was with Mr. Harper. But as far as -- I don't -- I don't think I had anything documented where I talked with Mr. Langley about it, but I suspect that he and I did talk about it.

(Doc. 48-10 at 6(17-18)). Later in her deposition, Carter was asked is she knew "that he had been a long-term methadone and Xanax and Soma user," to which she replied: "I don't think I knew that until I finally spoke with his mother . . . and got more information . . . on August the 7th of 2014." (Doc. 48-10 at 6(19)). Carter could not recall whether she knew that the Plaintiff had had a seizure or something which appeared to be a seizure. (Doc. 48-10 at 10(35)). According to Carter, the premise of her involvement was that the Jail medical personnel had determined there was not a medical issue.

It is undisputed that by getting Harper in a psychiatric bed, the county would have avoided the cost of Harper's hospitalization. (Doc. 51 at 25, ¶87; doc. 53(no dipute)). Ultimately, Harper was denied a psychiatric bed. Carter testified that she "didn't document anything as to why," but her thought "would have been because they thought it was the withdrawal, but I don't know if they actually ever said that to

me at that point or not. That's just what [the hospital representative] had said originally." (Doc. 48-10 at 13(47)). Lt. Langley testified that a psychiatric bad was found for the Plaintiff shortly before he left the Jail, and they "were waiting on a transport order to take him to [that] facility," although he did not know the facility. (Doc. 48-1 at 35(133)).

H.    **Sheriff Harris and Lt. Martin**

Lt. Martin was over the Jail at the time of Harper's incarceration and had an office at the front of the Jail so that he is "right there to be notified about anything that goes on in the jail." (Doc. 48-9 at 3(8)).  Lt. Martin did not have direct contact with the Plaintiff during his incarceration, but concedes that he would have been informed regarding an inmate like Harper with ongoing medical issues. Martin concedes he received reports from altercations involving Harper, including one in which Harper was banging his head. As a layperson, Lt. Martin agrees that a person who is banging their head needs a higher level of care. As a layperson, Lt. Martin agrees that a seizure should be treated as an emergency.

Stewart specifically recalls speaking with Lt. Martin about her concerns for Harper's well being. The following exchange took place in her deposition:

Q.    All right. Did you speak with Mr. Martin?

A.    Yes, I did.

* * *

Q.    All right. I'm just trying to figure out Mr. Martin, your conversations you had with him.

A.    Oh, basically telling me that Joey was fine, there was nothing wrong with Joey, he was being fed. I got a little perturbed with Mr. Martin, and I proceeded to tell him what I thought of him and his jail. And I believe that's the last time I talked to Mr. Martin.

       And that's when -- when I talked to him is when everything really started rolling as far as getting Joey out.

(Doc. 48-13 at 25(94)-26(97)). Lt. Langley says Lt. Martin was aware of Harper's condition and given daily updates.

Sheriff Harris's office is in the Jail as well, and he would be aware of significant issues regarding inmates. Sheriff Harris did not have direct contact with the Plaintiff during his incarceration and had no knowledge of any physical or mental issues that he was experiencing.

## IV.    ANALYSIS

### A.    Summary Judgment Will Be Granted to Defendants Black, Smith, and Hulgan

The Plaintiff agrees to the dismissal of Defendants Black, Smith, and Hulgan. (Doc. 51 at 7). Accordingly, summary judgment will be granted to each of them on both counts of the Complaint.

### B.    Summary Judgment Will Be Granted to All Defendants on the ADA Claim (Count Two)

37

The Defendants have moved for summary judgment on Count Two. (Doc. 47 at 34). The Plaintiff failed to respond to that argument in his brief. It has been noted that

> [t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.

*Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (internal citations omitted). The Court deems Count Two to be abandoned.

Furthermore, Count Two alleges a violation of Title II of the ADA which applies only to "public entities." 42 U.S.C.A. § 12132; *Owens v. Sec'y, Fla. Dep't of Corr.*, 602 F. App'x 475, 477 (11th Cir. 2015) ("'Only public entities are liable for violations of Title II of the ADA.'") (*quoting Edison v. Douberly*, 604 F.3d 1307, 1308 (11th Cir.2010)). Claims against public officials in their individual capacities are not cognizable under Title II of the ADA. *See Owens*, 602 F. App'x at 478 ("Owens fails to state ADA claims against Crews, Bateman, Sheffield, and Lawrence in their individual capacities."). Summary Judgment will be awarded to all of the Defendants, and against the Plaintiff, on Count Two.

C.  <u>Count One</u>

Count One is the only count remaining. In this count the Plaintiff claims that

the Defendants violated his constitutional rights when they "were deliberately indifferent to Harper's serious medical needs." (Doc. 1 at 9, ¶55).

The Defendants argue that they are entitled to qualified immunity as to the deliberate indifference claims in Count One. Very recently, the Eleventh Circuit explained:

> "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (internal quotation marks omitted). "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).
>
> To be clearly established, a right must be well-established enough "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) (internal quotation marks omitted and alteration adopted). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate" and thus given the official fair warning that his conduct violated the law. *Id.* (emphasis added); *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) ("The critical inquiry is whether the law provided [Defendant officers] with 'fair warning' that their conduct violated the Fourth Amendment.").
>
> Fair warning is most commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose. *See Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012). However, a judicial precedent with identical facts is not essential for the law to be clearly established. *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010). Authoritative judicial decisions may

"establish broad principles of law" that are clearly applicable to the conduct at issue. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1209 (11th Cir. 2007). And occasionally, albeit not very often, it may be obvious from "explicit statutory or constitutional statements" that conduct is unconstitutional. *Id*. at 1208–09. In all of these circumstances, qualified immunity will be denied only if the preexisting law by case law or otherwise "make[s] it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Youmans*, 626 F.3d at 563.

A defendant who asserts qualified immunity has the initial burden of showing he was acting within the scope of his discretionary authority when he took the allegedly unconstitutional action. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Assuming the defendant makes the required showing, the burden shifts to the plaintiff to establish that qualified immunity is not appropriate by showing that (1) the facts alleged make out a violation of a constitutional right and (2) the constitutional right at issue was clearly established at the time of the alleged misconduct. *See Perez v. Suszczynski,* 809 F.3d 1213, 1218 (11th Cir. 2016).

*Gates v. Khokhar*, 884 F.3d 1290, 1296–97 (11th Cir. 2018), *cert. denied*, No. 18-511, 2019 WL 113142 (U.S. Jan. 7, 2019).

### 1. *Each of the Defendants Acted within the Scope of Their Respective Discretionary Authority*

"An official acts within his discretionary authority if his actions (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 (11th Cir. 2017) (internal quotation marks omitted). The Plaintiff does not dispute that each of the Defendants was acting within the scope of

his discretionary authority at all times. Furthermore, it is clear that each was doing so either by setting policies for the Jail, providing direct medical care to the Plaintiff, or supervising others in their care of the Plaintiff. *See Nam Dang*, 871 F.3d at 1279 (health care providers acted within the course and scope of their discretionary authority in providing care to inmate); *Shaw v. Coosa Cty. Comm'n*, 434 F. Supp. 2d 1179, 1190 (M.D. Ala. 2005) (Fuller, J.) (setting policies and procedures regarding medical screening for jail inmate, medical treatment for jail inmates, training for jail staff, and other policies relating to the jail administration were discretionary functions of Sheriff). The Plaintiff makes no argument to the contrary.

The burden now shifts to the Plaintiff to show that qualified immunity is not appropriate for the Defendants because (1) the facts alleged make out a violation of a constitutional right and (2) the constitutional right at issue was clearly established at the time of the alleged misconduct.

> **2.** *Whether Each Defendant Violated the Plaintiff's Constitutional Rights*

"Because the Eighth Amendment[23] prohibits deliberate indifference to the

---

[23] Because the Plaintiff was detained for non-payment of child support, the Plaintiff implies that he may have been a "pretrial detainee" (doc. 51 at 33, and n. 2), and, as noted above, claims a Fourteenth Amendment violation. The Eleventh Circuit has noted:

> Technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like Goebert. *Snow ex rel. Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1268

serious medical needs of prisoners, 'deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.'" *Barcelona v. Par.*, No. 17-15050, 2018 WL 4502197, at *1, --- F. Appx. ---, n. 1 (11th Cir. Sept. 19, 2018) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

> To demonstrate deliberate indifference in violation of the Eighth Amendment, a plaintiff must show "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009). A serious medical need is one that objectively "posed a substantial risk of serious harm" if left untreated. *Gilmore v. Hodges*, 738 F.3d 266, 274 (11th Cir. 2013).

*Barcelona*, 2018 WL 4502197, at *2.

### a. The Plaintiff's Drug Withdrawal Was a Serious Medical Need

A "serious medical need" is "'one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment.'" *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir. 2010) (*quoting Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008)). "'In the alternative, a serious medical need is determined by whether a delay in treating the

---

(11th Cir.2005). However, the standards under the Fourteenth Amendment are identical to those under the Eighth. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115 (11th Cir.2005).

*Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

need worsens the condition.'" *Kuhne v. Fla. Dep't of Corr.*, 745 F.3d 1091, 1096 (11th Cir. 2014) (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009)).

In the Complaint, the Plaintiff identifies the following "serious medical needs": drug withdrawal, withdrawal symptoms, life-threatening seizures, lack of calorie intake, dehydration, and psychosis. (Doc. 1 at 9, ¶55). The Plaintiff's brief argues only that the Plaintiff's <u>drug withdrawal</u> was a serious medical need (doc. 51 at 35-36), but also notes that Harper had "multiple conditions" (altered mental status, seizures, lack of calorie intake, dehydration, extreme sleep deprivation, self harm/head banging, and general physical deterioration) which were the result of "drug withdrawal in general and benzodiazepine withdrawal in particular" (doc. 51 at 39, 40). While the Defendants concede that "Plaintiff's withdrawal and/or mental health issues" were a serious medical need (doc. 47 at 27),[24] their initial brief does not specifically mention the other issues in terms of each being separate a serious medical need.[25]

---

[24] The Defendants do not concede that the Plaintiff's alleged achalasia was a serious medical need. (Doc. 47 at 27). However, the Plaintiff makes no claim of deliberate indifference as to his alleged achalasia.

[25] In their reply brief, the Defendants note:

Plaintiff's theory of the case is as follows: 1) <u>all of his symptoms were caused by drug withdrawal</u>; 2) Defendants actually knew and appreciated this fact; but 3) made the deliberate choice to provide substandard treatment to him, causing him

Based on the allegations in the Complaint and the Plaintiff's response brief, along with the fact that the Defendants do not directly attack the other alleged serious medical needs set out in the Complaint, the Court holds that, for the purposes of the instant Motion, the Plaintiff was suffering from the serious medical need of <u>drug withdrawal</u>, which manifested itself through altered mental status, seizures, lack of calorie intake, dehydration, extreme sleep deprivation, self harm/head banging, and general physical deterioration.

> **b.** **Whether Each Defendant Was Deliberately Indifferent to the Plaintiff's Drug Withdrawal in a Manner Which Caused Him Injury**

A defendant may be liable for a constitutional violation only when he or she "personally participates" in the alleged constitutional violation or when there is a "causal connection between actions of the supervising official and the alleged constitutional deprivation." *Danley v. Allen*, 540 F.3d 1298, 1314 (11th Cir. 2008). In the instant case the Plaintiff alleges both. The Court will address each in turn.

> **(1)** **The Personal Participation Claims**

> **(a)** **General Standards**

Deliberate indifference, has three components: "'(1) subjective knowledge of

injury.

(Doc. 53 at 6, n.4) (underlining added). This is all the Defendants have to say about this issue in their reply.

44

a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.'" *Hunt v. Warden*, 748 F. App'x 894, 899 (11th Cir. 2018) (*quoting Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003) (internal quotation marks omitted)); *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017).

"Subjective knowledge of the risk requires that the defendant be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Johnson v. Bessemer, Alabama, City of*, 741 F. App'x 694, 700 (11th Cir. 2018) (*quoting Nam Dang*, 871 F.3d at 1280 (internal quotation marks omitted in original)). "'[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew].'" *Nam Dang*, 871 F.3d at 1280 (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (citations omitted)). "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) *(quoting Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811

(1994) (citation omitted)).

The Eleventh Circuit has written:

> An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009). Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs. *See Harris v. Coweta Cty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) (*citing Brown v. Hughes*, 894 F.2d 1533, 1537–39 (11th Cir. 1990)). Further, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted). However, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

*Nam Dang*, 871 F.3d at 1280 (emphasis added).

### (b)     Dr. Theakston and Lt. Langley

### i)     Subjective Knowledge

The Defendants make <u>no</u> argument in their initial brief that Dr. Theakston and Lt. Langley each did <u>not</u> know that Harper was experiencing severe drug withdrawal. Instead, the Defendants only state generally that there is no evidence that "the medical judgment exercised . . . amounted to deliberate indifference." (Doc. 47 at

29).[26] The Defendants explain a few lines later in their brief that "these Defendants took affirmative steps to diagnose and treat the Plaintiff . . . throughout the course of his incarceration." (Doc. 47 at 29; *see also* doc. 47 at 29-31). Accordingly, it seems that, at least in their initial brief, the Defendants have conceded that Dr. Theakston and Lt. Langley each knew that Harper was experiencing severe drug withdrawal, and challenge only whether they each disregarded that risk by conduct which was more than mere negligence.

Things get confusing when the Plaintiff's response brief is considered. Despite the Defendants' failure to challenge the subjective knowledge prong of the test, the Plaintiff's brief curiously argues that "Defendants claim they did not understand that Harper's condition was actually due to drug withdrawal generally or benzodiazepine withdrawal in particular." (Doc. 51 at 39). The Plaintiff then argues that the Defendants either did have such knowledge, or else the need for better care was obvious. (*See* doc. 51 at 39-43). Despite the fact that "[e]ach individual defendant must be judged separately and on the basis of what that person kn[ew]," *Nam Dang*, 871 F.3d at 1280, the Plaintiff treats all of the Defendants, both medical and non-medical, collectively. Thereafter, in their reply brief, the Defendants argue that Dr.

---

[26] As noted above, "deliberate indifference" is a term of art, and deliberate indifference only exists when a particular defendant has subjective knowledge of a risk of serious harm, which he or she disregarded, by conduct that is more than mere negligence. Accordingly, the vague reference to "deliberate indifference" alone is no help.

Theakston and Lt. Langley, collectively, did <u>not</u> have subjective knowledge that the Plaintiff's symptoms were caused by drug withdrawal. (Doc. 53 at 6-10).

The initial question the Court must answer is whether the "subjective knowledge" issue is properly before it on summary judgment. Certainly "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court." *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (internal quotations and citations omitted); *Essex Ins. Co. v. Foley*, 827 F. Supp. 2d 1326, 1330 (S.D. Ala. 2011) (Steele, J.) (issue "not properly raised" when raised for the first time in a reply brief to a motion for summary judgment). However, the subjective knowledge issue can be considered when it was first raised by the <u>Plaintiff</u> in his response brief. *See Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1349 (N.D. Ga. 2017) (denying motion for leave to file sur-reply where "Defendants' reply . . . squarely responds to the arguments in Plaintiffs' response brief, and does not advance new arguments."). Furthermore, the rationales for not allowing arguments to be raised for the first time in a reply brief, such as incentivizing litigants to raise their best arguments in a reply and disadvantaging litigants who are not able to repond to those arguments[27], are not implicated when the issue is raised by the

---

[27] *See Hardy v. Jim Walter Homes, Inc.*, No. CIV.A. 06-0687WSB, 2008 WL 906455, at *8 (S.D. Ala. Apr. 1, 2008) (Steele, J.).

Plaintiff in a response brief. Accordingly, the Court can consider this issue.

Regardless, the Court still determines that summary judgment is due to be denied Dr. Theakston on this issue. First, and as noted previously in this opinion, for issues in which the Defendants do not bear the burden of proof at trial, such as the subjective knowledge issue, they can meet their burden on a summary judgment either by showing that there is a lack of evidence to support this issue or by providing affirmative evidence which demonstrates that the Plaintiff cannot prove this issue at trial. (*See supra* section II; *Fitzpatrick*, 2 F. 3d at 1116-1117). Although it is unclear which approach the Defendants are taking, their arguments fail under either approach. The Defendants do not <u>deny</u> that Dr. Theakston knew that the Plaintiff was experiencing severe drug withdrawal. They also cite no statement, sworn or unsworn, from any witness saying as much. Instead, they only address one "example" cited by the Plaintiff, the July 15th incident at the jail and subsequent trip to the emergency room, and refer to the Plaintiff's discussion of the evidence as "cherry picked." (Doc. 53 at 6-7). They also argue that the Plaintiff has ignored the Plaintiff's second trip to the emergency room where he "was simply treated and released." (Doc. 53 at 7). But they completely ignore the substance of <u>all</u> of the evidence cited by the Plaintiff, including, in addition to the initial trip to the emergency room,

> Harper's Xanax history, the known fact that seizures are associated with benzodiazepine withdrawal, Langley's failure to tell mental health the

49

critical medical facts (Xanax history and seizures), Langley's representations to the family that Harper needed "medical" treatment (and no mention of any mental health issue), and the free hospital bed available if mental health took Harper.

(Doc. 51 at 39-40). The Defendants have not satisfied their burden.

Furthermore, a reasonable jury could find that Dr. Theakston's knowledge of the drugs the Plaintiff was taking and the possible symptoms of withdrawal from same, along with the evidence of the symptoms he actually had, made it obvious that the Plaintiff was experiencing severe drug withdrawal. This is true especially after the Plaintiff began having seizures, which Dr. Theakston admitted in his deposition "indicate at least a moderate level of withdrawal." (Doc. 48-3 at 20(75-76)). Summary Judgment will be denied to the Dr. Theakston on the issue of whether he had subjective knowledge of the Plaintiff's drug withdrawal while the Plaintiff was at the Jail.

Lt. Langley's knowledge is another issue however. It is undisputed that Lt. Langley's opinion at the time, and still today, is that the Plaintiff's issues were mental health related and not from drug withdrawal. (Doc. 48-1 at 35(136)). Because he lacked subjective knowledge that the Plaintiff was experiencing severe drug withdrawal symptoms, he could not have deliberately disregarded those symptoms. Accordingly, Langley committed no constitutional violation and is entitled to qualified immunity. Summary judgment will be granted to Langley and against the

Plaintiff as to Count One.

                **ii)**    **Disregard of the Risk by Conduct Which Is More Than Mere Negligence**

The Plaintiff argues that Dr. Theakston and Lt. Langley were deliberately indifferent when they decided "to manage persons experiencing benzodiazepine withdrawal seizures in the jail with anti-seizure medication and observation by jailers, who were not medically trained." (Doc. 51 at 38). This level of drug withdrawal, the Plaintiff argues, "when associated with benzodiazepines dependence, is dangerous and cannot be safely managed in a jail due to the risk of death." (Doc. 51 at 39).

"The question of whether additional diagnostic techniques or alternate forms of treatment should be employed constitutes 'a classic example of a matter for medical judgment'" and does not support an Eighth [or Fourteenth] Amendment claim." *Clas v. Torres*, 549 F. App'x 922, 923 (11th Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S. Ct. 285, 293, 50 L. Ed. 2d 251 (1976)). "Moreover, '[w]here a prisoner has received ... medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law.'" *Boone v. Gaxiola*, 665 F. App'x 772, 774 (11th Cir. 2016) (quoting *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (internal quotation omitted)). To show "grossly

inadequate treatment" in cases where medical judgments are involved, "'a plaintiff may need to do more than refer to prior cases ... [and instead] produce opinions of medical experts which assert that the official's actions were so grossly contrary to accepted medical practices as to amount to deliberate indifference.'" *Davis v. Madison Cty., Alabama*, No. 5:16-CV-01166-AKK, 2018 WL 3631707, at *6 (N.D. Ala. July 31, 2018) (Kallon, J.) (quoting *Howell v. Evans*, 922 F.2d 712, 720 (11th Cir. 1991)).

In the instant case, in addition to the national standards set out in section III.A. herein, the Plaintiff has produced the expert report of Dr. Homer Venters, who opines that the Plaintiff had been prescribed a "significant dose" of Xanax "and his documented longstanding use of this medication makes it virtually certain that he would experience the physical effects of benzodiazepine withdrawal in jail without treatment." (Doc. 48-30 at 6). He states that the health staff at the jail "repeatedly dismissed their own records during subsequent physician review of the clearly marked seizure history and active benzodiazepine use." (Doc. 48-30 at 6). He notes the standard of care in correctional medicine is

> to provide a gradual taper off of benzodiazepines, which can be effectively achieved over a matter of weeks. This standard of care also involves switching patients from quick acting agents like Xanax (alprazolam) to longer acting ones such as diazepam or clonazepam.

(Doc. 48-30 at 7). He states that the "precipitous withdrawal from [the Plaintiff's]

longstanding and documented community treatment with benzodiazepines" caused the Plaintiff to experience "a series of seizures and other potentially fatal complications." (Doc. 48-30 at 10). He continues:

> Up to his release from jail, health staff continued to ignore the most likely (and well documented) cause of Mr. Harper's seizures and other complications of benzodiazepine withdrawal and made efforts to prescribe and administer an antipsychotic as well as anti-seizure medication. Neither of these medications was appropriate given the knowledge of serious benzodiazepine use and timing of neurological symptoms of seizure, agitation and volatility that appeared in weeks 2 and 3 of detention.

(Doc. 48-30 at 9).

> In a jail setting, if long acting benzodiazepines were not available to effectively taper Mr. Harper off his Xanax, jail health staff had two options. First, they could have transferred him for treatment of benzodiazepine withdrawal at a hospital or other setting or second, they could attempt treatment with alternative medications including Visteril, Propanolol or Buspirone. These medications do not represent a community-standard of care for treatment of benzodiazepine withdrawal but they can be used to reduce symptoms, in conjunctions with close medical monitoring. As Mr. Harper's seizures and overall health worsened, jail health staff repeatedly ignored critical information that they had gathered themselves.

(Doc. 48-30 at 8).[28, 29]

---

[28] The Defendants argue that the Plaintiff "has not put forth any expert of medical testimony as to what Sheriff Harris and his staff should have done differently." (Doc. 47 at 23-24). To the extent that the Defendants are referring to medical personnel as being part of "the Sheriff's staff," they are obviously incorrect. Also, the Defendants write:

> Even assuming, arguendo, and for the purposes of this Motion only, that Dr. Venters were a qualified expert witness and that his report and/or testimony were

> admissible, it is insufficient to carry Plaintiff's burden of proof. Most of his report targets supposed inadequacies in record-keeping that are admittedly not causally connected to the injuries alleged by Plaintiff. It is telling that the most significant errors that he attempted to assign to the "jail health staff" in general is their supposed failure to catch and correct errors that Dr. Venters claims were actually made by physicians at DeKalb Regional Medical Center. (Ex. DD, Doc. 34-1, pgs. 7,8.)

(Doc. 47 at 30). There are a number of problems with this argument. First, the Defendants do not attack, through a Motion to Strike or otherwise, the qualifications of Dr. Venters, or the admissibility of his report. Their admissibility argument, in short, is insufficiently developed. Second, the Defendants' argument does not address Dr. Venters's opinions identified by the Court in this section.

[29] Although the Defendants have filed into the record the report of their expert, Dr. Robert Jones (doc. 48-29), they cite to it very little. They note that Dr. Jones opines that it was reasonable for the jail staff to defer to the hospital's recommendations after the Plaintiff returned on July 16th. (Doc. 47 at 30) (citing 48-29 at 11). This opinion is irrelevant to whether, once the Plaintiff began having seizures, he should have been sent to the hospital. The Defendants also note that Dr. Jones

> also faults Dr. Venters for failing to "make a distinction between different classes of benzodiazepines" in his Report, noting that Xanax "would not explain Mr. Harper's observed behavior" and opining that there is not enough evidence to "second guess the conclusion by the ER physician that Mr. Harper was being uncooperative."

(Doc. 47 at 30) (citing doc. 48-29 at 11). Again, these opinions all address only how the Defendants reacted after the first hospital visit, and do not address the opinion set out above. No other opinions of Dr. Jones have been cited.

The Defendants note vaguely in their reply brief that the Plaintiff "has wholly ignored the expert report submitted by Dr. Jones as well as any of the deficiencies identified in Dr. Venters's report." (Doc. 53 at 7). They also argue, without citation, that there is "conflicting expert testimony." (Doc. 53 at 8). The Court declines this invitation to review the entire report of Dr. Jones and determine for the Defendants which parts of it arguably help their case. "The court need consider only the cited materials." Fed. R. Civ. P. 56(c)(3). "[A]ppellate judges are not like pigs, hunting for truffles buried in briefs. Likewise, district court judges are not required to ferret out delectable facts . . .." *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (internal quotations and citation omitted).

drugs, had a history of seizures, and had been taking a higher dose of Xanax for so long, he was at risk for severe drug withdrawal, and that his seizures were evidence of same. But Dr. Theakston interpreted the Jail's Policy to <u>require</u> cold turkey withdrawal. The following exchange took place in his deposition:

> Q.    But you interpreted this policy to not allow for weaning somebody off of current narcotic and -- narcotic medications and benzodiazepines?
>
> A.    Correct.
>
> Q.    Did you ever -- and you knew some of the -- that there are consequences to that for the inmates who came in on those medications, right?
>
> A.    Yes.

(Doc. 48-4 at 6(17)). Dr. Theakston also agreed that a person experiencing seizures as a result of drug withdrawal should have been treated at a hospital.[30] He also agreed that if he was working in an emergency room, and someone who had experienced Harper's symptoms presented to him, that he would "probably" admit that patient. (Doc. 48-3 at 21(79)).[31] On July 23, 2014, after the Plaintiff had another documented

---

[30] In their initial brief, the Defendants acknowledge that "county jails are ill-equipped to serve as specialized rehabilitation and/or mental health facilities, and that such care is better left to hospitals." (Doc. 47 at 23).

[31] The following exchange took place in Dr. Theakston's deposition:

> Q.    If a patient comes in with a history of cold turkey benzodiazepines use withdrawal over multiple days with altered mental status and a fall that lead to a head injury and an observed possible seizure, at least one, are you going to -- aren't you going to admit that person?

case of non-responsiveness, Dr. Theakston noted that the Plaintiff had begun experiencing altered mental status a few days after being removed from Xanax and Methodone. (Doc. 47 at 17, ¶46; Plaintiff does not dispute). Still, contrary to the Jail's withdrawal treatment policy, <u>which the Defendants admit requires hospitalization under such circumstances</u>[32], he was not sent to the hospital for treatment of his withdrawal symptoms.

A reasonable jury could find that this it was more than mere negligence which led to Dr. Theakston to not send the Plaintiff to the hospital once the seizures began, and possibly before. There is substantial evidence that Dr. Theakston, knowing full well that the Plaintiff was experiencing severe drug withdrawal symptoms, including seizures, and knowing that due to the Policy[33] he could not treat the Plaintiff with controlled substances, decided, in contravention of the Jail withdrawal treatment policy[34], against sending him to the hospital and instead treated him with anti-seizure

---

A. I would probably admit that patient.

(Doc. 48-3 at 21(79)).

[32] *See* doc. 47 at 7, ¶7 ("[T]he policy is that any person who appears to need more or different treatment for withdrawal is to be immediately transported to the hospital for treatment.") (citations omitted).

[33] That is, the no narcotics policy.

[34] *See* note 32.

medication.[35], [36] There is also substantial evidence in the record that this decision caused injury to the Plaintiff. Summary judgment will be denied to Dr. Theakston as to Count One.

As to Lt. Langley on the other hand, the Plaintiff has cited no evidence that Lt. Langley, who is a nurse, not a doctor, could have done anything differently once Dr. Theakston ordered a plan of treatment for the Plaintiff. Accordingly, even if there were evidence that Lt. Langley was aware that the Plaintiff was experiencing severe drug withdrawal, there is no evidence that Lt. Langley disregarded that risk. For this reason as well, summary judgment will be granted to Lt. Langley as to Count One.

---

[35] The Defendants correctly note that the Plaintiff was taken to the hospital twice, and they insist that this was done as part of their policy to provide "additional support" for prisoners experiencing withdrawal symptoms. (Doc. 47 at 4). The Court does not agree with the Defendants that because the hospital did not admit the Plaintiff on either visit, they "were caught between the proverbial rock and hard place, forced to house Plaintiff pursuant to a court order while attempting to fix a problem that they did not create with resources they did not have." (Doc. 47 at 4). One such visit occurred on July 17, 2014, the day after the Plaintiff's seizure. However, there is no evidence that the hospital was made aware of the seizure at that visit, or that the Plaintiff was sent there for any other reason than to treat his head injury. In other words, the evidence, when viewed in the light most favorable to the Plaintiff, shows that the Plaintiff was not referred for treatment of his withdrawal symptoms, and the hospital was not given enough information from which to infer that the Plaintiff was experiencing these severe symptoms or was injured because of them. Moreover, there is no evidence that the Defendants did not have access to drugs to wean the Plaintiff. Rather, the evidence is that the Defendants chose not to administer such drugs themselves, and to refer prisoners to hospitals for such drug treatment, a choice that Dr. Theakston chose not to follow.

[36] The Defendants argue that Dr. Pruett's refusal to prescribe Xanax to the Plaintiff after he left the jail is evidence that they were not deliberately indifferent in denying the Plaintiff his medications. (Doc. 47 at 24). The Court notes that Dr. Pruett's opinion on August 11, 2014, as to whether the Plaintiff should be on Xanax is irrelevant to the issue of whether while the Plaintiff was in the Jail, his withdrawal symptoms were properly treated.

### (c)     Sheriff Harris

The Defendants argue that "there is no evidence whatsoever that Sheriff Harris possessed any subjective knowledge." (Doc. 47 at 31). The Plaintiff argues that "Sheriff Harris [was] informed regarding Harper's condition." (Doc. 51 at 41) (citing doc. 51 at 26, ¶¶92-99). The only evidence cited by the Plaintiff in support of this proposition is the following exchange from Martin's deposition:

> Q.     Well, I mean, where's the sheriff's office?
>
> A.     Here.
>
> Q.     So he's here. Okay. So if there's an inmate with a significant issue going on in the jail, is that something the sheriff is going to be aware of?
>
> A.     Yes.

(Doc. 48-9 at 15(54)). In no way does this evidence establish that Harris was <u>actually aware</u> that the Plaintiff was undergoing severe withdrawal symptoms, much less that he personally participated in the denial of care to the Plaintiff.

Furthermore, "[s]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care." *Williams v. Limestone Cty.*, Ala., 198 F. App'x 893, 897 (11th Cir. 2006) (*citing Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir.1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir.1988)). "Prison officials are not under a duty to directly supervise medical personnel or to intervene in treatment decisions where they have no actual knowledge that

intervention is necessary to prevent a constitutional deprivation." *Kelly v. Ambroski*, 97 F. Supp. 3d 1320, 1343 (N.D. Ala. 2015) (Haikala, J.) (*citing See Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir.2004); *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir.1996); *Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir.1977)).

There is no evidence that Sheriff Harris personally participated in a denial of the Plaintiff's constitutional rights. Accordingly, there was no constitutional violation and the Sheriff is entitled to qualified immunity. Summary judgment will be granted to Sheriff Harris as to the personal participation claim against him in Count One.

### (d)    Lt. Martin

Despite Martin's knowledge that the Plaintiff was experiencing certain issues, there is no evidence in the record that he <u>knew that he must intervene in the treatment of the Plaintiff</u>. Furthermore, he too is entitled to rely on the medical judgment of Dr. Theakston, and there is no evidence that Lt. Martin personally participated in a denial of the Plaintiff's constitutional rights. Accordingly, there is no constitutional violation and Lt. Martin is entitled to qualified immunity. Summary judgment will be granted to Lt. Martin as to the personal participation claim against him in Count One.

## (2)    The Supervisory Liability Claim Against Sheriff Harris[37]

The Plaintiff alleges that it was Sheriff Harris's adoption of the no narcotics policy itself which constituted deliberate indifference.[38] The Eleventh Circuit has held that if a Sheriff "established or utilized a policy or custom . . . then he would be liable if the result of that policy or custom played a role in any deliberate indifference to [a prisoner's] medical needs*.*" *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 706 (11th Cir. 1985). The Sheriff agrees that the no narcotics "policy has been interpreted by the Jail physician medical staff to not permit narcotics and benzodiazepines, like

---

[37] In their reply brief, the Defendants, in a footnote, write that

> [since the] Plaintiff did not directly respond to Defendants' arguments regarding supervisory liability, it appears that Plaintiff has abandoned any claim based on supervisory liability and is instead traveling only under a theory of personal participation as to all Defendants.

(Doc. 53 at 6, n. 4). The Court does not agree in light of the fact that an entire section of the Plaintiff's brief is dedicated to a discussion of the no narcotics policy. (*See* doc. 51 at 36-38).

[38] The Plaintiff seems to argue that all of the Defendants are subject to supervisory liability when he states:

> This deliberately-indifferent policy was put in place by Sheriff Harris and was implemented by Sheriff Harris and Chief Jail Administrator Martin, who ran the jail, and by defendants Theakston and Langley, who managed the medical care program at the jail and acquiesced to this policy despite the obvious negative impact on inmates.

(Doc. 51 at 38). As noted by the Plaintiff, it was Sheriff Harris's policy alone. Martin, Theakston, and Langley can only be liable to the extent that they each personally participated in the alleged constitutional violation.

60

Xanax, to people [who] are prescribed them." (Doc. 48-8 at 9(30)).  Regardless, it is undisputed that the Jail's withdrawal treatment policy required hospitalization of the Plaintiff for his severe symptoms.  Thus it was Dr. Theakston's failure to follow <u>that</u> policy, not his adherence to the no narcotics policy, which allegedly caused the Plaintiff's injuries.  Accordingly, there is no causally linked constitutional violation and the Sheriff is entitled to qualified immunity.  Summary judgment will be granted to the Sheriff as to the supervisor liability claim against him in Count One.

### 3.    *Clearly Established Law*

The Plaintiff argues, incorrectly, that qualified immunity is unavailable to Defendants who are "guilty of deliberate indifference." (Doc. 51 at 42). "Whether or not [a] Defendant's conduct constituted deliberate indifference," the Plaintiff must still show that "the law applicable to these circumstances" was clearly established at the time. *Youmans v. Gagnon*, 626 F.3d 557, 562–63 (11th Cir. 2010).

> "Clearly established" means that, at the time of the officer's conduct, the law was " 'sufficiently clear' that every 'reasonable official would understand that what he is doing' " is unlawful. [*Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2084, 179 L. Ed. 2d 1149 (2011)] (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." *al–Kidd, supra*, at 741, 131 S.Ct. 2074. This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam ), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd, supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See* [*Reichle v. Howards*, 566 U.S. 658, 666, 132 S. Ct. 2088, 2094, 182 L. Ed. 2d 985 (2012)]. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam ). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." [*Plumhoff v. Rickard*, 572 U.S. 765, 778, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056 (2014)] (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson, supra*, at 641, 107 S.Ct. 3034.

*D.C. v. Wesby*, 138 S. Ct. 577, 589–90, 199 L. Ed. 2d 453 (2018). The Eleventh

Circuit has held that "constitutional provisions, federal statutes, and judicial decisions

of the United States Supreme Court, the United States Court of Appeals for the

Eleventh Circuit, and the highest court of the relevant state are all capable of clearly establishing the law." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1200 (11th Cir. 2007).

The Defendants argue that "[t]here is no clearly established law dictating an exact protocol for the treatment of those victims of America's substance abuse epidemic who end up incarcerated in our jails and prisons." (Doc. 47 at 22). However, there is clearly established law that the withdrawal of <u>prescribed</u> treatment can itself constitute deliberate indifference. *See Chatham v. Adcock*, 334 F. App'x 281, 289 (11th Cir. 2009) (discussing *Steele v. Shah*, 87 F.3d 1266, 1268 (11th Cir. 1996), as amended (Sept. 6, 1996)); *Thomas v. Humphrey*, No. 5:13-CV-108 MTT, 2014 WL 1056699, at *5 (M.D. Ga. Mar. 19, 2014). Also, "a defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference." *Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003); *see also*, *Scott*, 2009 WL 3028306 at *2 (denial of summary judgment to Sheriff who had allowed implementation of no narcotics policy by medical contractor). Furthermore, it is also clearly established that "'[a]n official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate.'" *Alsobrook v. Alvarado*, 656 F. App'x 489, 494 (11th Cir. 2016) (quoting *Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1425 (11th Cir. 1997)). In addition, at the

time of the events of this case, the Eleventh Circuit had already held that "'a jail official who is aware of but ignores the dangers of acute alcohol withdrawal and waits for a manifest emergency before obtaining medical care is deliberately indifferent to the inmate's constitutional rights.'" *Harper v. Lawrence Cty., Ala.*, 592 F.3d 1227, 1235 (11th Cir. 2010) (*quoting Lancaster*, 116 F.3d at 1426) (citing *Morrison v. Washington County*, 700 F.2d 678 (11th Cir.1983)). The instant case, like *Harper*, *Lancaster*, and *Morrison*, also deals with the serious complications from drug withdrawal, albeit benzodiazepine withdrawal instead of alcohol. Accordingly, the cases clearly establish the rule that jail officials must treat the serious medical need of <u>withdrawal</u>. Dr. Theakston is not entitled to qualified immunity for the actions he took in treating the Plaintiff.

## V. CONCLUSION

For the foregoing reasons, summary judgment is **DENIED** to Dr. Theakston on the personal participation claim against him in Count One. In all other respects, summary judgment is **GRANTED** in favor of the Defendants and against the Plaintiff.

**DONE** and **ORDERED** this 21st day of February, 2019.

**VIRGINIA EMERSON HOPKINS**
Senior United States District Judge